UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| APPROOV LTD.,<br><br>Plaintiff,<br><br>v.<br><br>GUARDSQUARE NV, GUARDSQUARE INC., and GUARDSQUARE GmbH,<br><br>Defendants. | Civil Action No.: 1:26-cv-13924<br><br>**DEMAND FOR JURY TRIAL** |

## APPROOV'S COMPLAINT FOR PATENT INFRINGEMENT

1. Plaintiff, Approov Ltd. ("Approov" or "Plaintiff"), files this Original Complaint for Patent Infringement against Guardsquare NV, Guardsquare Inc., and Guardsquare GmbH (collectively "Guardsquare" and "Defendants"), and would respectfully show the court as follows:

## SUMMARY OF THE ACTION

2. This is an action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code. Approov seeks to stop Guardsquare's unauthorized use of Approov's patented technology for client software attestation in mobile applications.

3. Specifically, Guardsquare's mobile app attestation products, services, and systems, inclusive of Guardsquare's client-side components that are integrated into the mobile devices of its users, backend servers of its clients, and into its server-side attestation servers, infringe one or more claims of U.S. Patent No. 11,163,858 (the "'858 Patent"), entitled "Client Software Attestation," which Approov owns.

## PARTIES

4. Plaintiff Approov Ltd. is a private limited company organized and existing under the laws of the United Kingdom, with its principal place of business at Atria One, 144 Morrison Street, Edinburgh, EH3 8EX, United Kingdom. Approov maintains U.S. operations and headquarters at 165 University Avenue, Suite 200, Palo Alto, California 94301. Approov was originally organized as Critical Blue Ltd, an Edinburgh-based engineering firm founded in 2002, that applied its engineering expertise toward mobile API security but has since changed its name to Approov Ltd. while continuing to develop the Approov mobile app attestation products and services. Approov has all rights protected by the '858 Patent.

5. Upon information and belief, Defendant Guardsquare NV is a public limited company (naamloze vennootschap) organized and existing under the laws of Belgium, with its registered office at Tervuursevest 362, bus 1, 3000 Leuven, Belgium, which provides mobile application security solutions, including its mobile app attestation service, to its clients in the United States and abroad.

6. Upon information and belief, Defendant Guardsquare Inc. is a corporation organized and existing under the laws of the State of Delaware with a regular and established place of business at 99 Summer Street, Floor 10, Suite 1010, Boston, Massachusetts 02110. Guardsquare Inc. is the U.S. entity and subsidiary of Guardsquare NV, and provides marketing, sales, and support to Guardsquare NV's clients in the United States and abroad. Guardsquare Inc. operates as the principal United States affiliate of the Guardsquare group of companies, which is led by its Belgian parent Guardsquare NV. Guardsquare Inc. maintains its United States operating presence in Boston, Massachusetts, and is responsible for the commercialization, sale, deployment, and customer support of the Guardsquare mobile application security platform

across the Americas.

7. Upon information and belief, Guardsquare GmbH is a limited liability company (Gesellschaft mit beschränkter Haftung) registered with the Munich commercial register under HRB 257934, with its principal place of business and headquarters located at Rosenheimer Strasse 143 C, 81671, Munich, Germany. Guardsquare GmbH was organized under the laws of Germany and provides significant research, development, and engineering support to Guardsquare NV and Guardsquare Inc.

## JURISDICTION

8. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States.

9. This Court has personal jurisdiction over Defendant Guardsquare NV because Defendant Guardsquare NV has committed acts of infringement within this District, and has a regular and established place of business in this District, both directly and indirectly, through its subsidiary Guardsquare Inc. On information and belief, Guardsquare NV has custody and control over Guardsquare Inc., and has induced and, directly or indirectly, caused Guardsquare Inc. to commit acts of infringement on its behalf.

10. This Court has personal jurisdiction over Defendant Guardsquare Inc. because Defendant Guardsquare Inc. is headquartered in this District, has a regular established place of business in this District, and has committed acts of infringement within this District.

11. This Court has personal jurisdiction over Defendant Guardsquare GmbH because Defendant Guardsquare GmbH has committed acts of infringement within this District, and has a regular and established place of business in this District, both directly and indirectly, through Guardsquare Inc. On information and belief, Guardsquare GmbH has provided research,

development, and engineering support to Guardsquare's customers in this District. Further and in the alternative, this Court has personal jurisdiction over Defendants Guardsquare NV and Guardsquare GmbH under Fed. R. Civ. P. 4(k)(2), because Approov's claims arise under federal law, neither defendant is subject to the general jurisdiction of the courts of any single state, and the exercise of jurisdiction is consistent with the United States Constitution and laws.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1400(b) because Defendants have committed acts of infringement in this District, either directly, or indirectly through a subsidiary, and maintained a regular and established place of business in this District, either directly, or indirectly through a fellow subsidiary. Venue is proper as to Guardsquare NV and Guardsquare GmbH for the additional and independent reason that each is an alien defendant: under 28 U.S.C. § 1391(c)(3), a defendant not resident in the United States may be sued in any judicial district, and the venue limitation of § 1400(b) does not apply to alien defendants.

## FACTUAL BACKGROUND

13. Guardsquare knowingly and willfully infringed Claims 1 and 18 of the '858 Patent by making, using, offering to sell, and selling a product, service, and system that performs substantially the same methods and implements substantially the same system as the '858 Patent. Guardsquare commercially offers for sale, and sells, at least three commercially available products and services that make and use the app attestation invention that infringes the method and system claims of the '858 Patent, including, but not limited to, DexGuard, iXGuard, and Mobile App Attestation.

14. Guardsquare knowingly and willfully induced Guardsquare's customers to infringe the '858 Patent by selling, maintaining, supporting, and providing software components,

integration materials, technical instructions, and implementation guidance that cause Guardsquare's customers to make and use substantially the same method and system as Claims 1 and 18 of the '858 Patent.

15. Approov designs, develops, and licenses software-based runtime mobile application attestation and Application Programming Interface (API) protection solutions that are claimed in the '858 Patent. Approov serves enterprises operating mobile-first business models in regulated and high-value sectors including financial services, fintech, retail and e-commerce, mobility and transportation, healthcare, and connected devices. Through its proprietary technology, Approov enables organizations to verify the authenticity and integrity of mobile applications communicating with backend services, thereby protecting APIs, business logic, and customer data from automated abuse, fraudulent traffic, and unauthorized access.

16. Approov's patented mobile application and API protection solution was first made commercially available in 2017 through Critical Blue Ltd., after more than two years of intensive development and several thousand hours of engineering.

17. In 2019, Approov disclosed its patented invention that it claimed in the '858 Patent to Guardsquare as part of a proposed joint venture.

18. Approov's flagship offering is its landmark Approov Mobile App Attestation service, a cloud-delivered, runtime security platform that combines on-device measurement of mobile application integrity with a cryptographically signed, short-lived attestation token that is presented by the genuine app to backend APIs on each request. APIs that adopt Approov reject any traffic that does not present a valid token, eliminating broad classes of automated abuse including scripts, bots, modified or "tampered" applications, instrumented or rooted environments, and traffic originating outside the legitimate mobile channel. The platform

supports native iOS and Android applications as well as common cross-platform development frameworks, and integrates with widely used API gateway, content-delivery, and identity management technologies. Approov's launch and successful commercialization of one of the first dedicated runtime mobile app attestation services available as a software-as-a-service offering established Approov as a recognized pioneer of the mobile API security category. Approov's security services protect large volumes of API transactions on behalf of enterprise customers across multiple regulated industries, with documented case studies in retail, banking, transportation, ticketing, and digital health.

19. Approov has invested heavily in proprietary research and development, resulting in a portfolio of granted patents, including the '858 Patent, in the United Kingdom and United States covering its inventions in application integrity verification and trusted communications between mobile clients and backend services. Approov has a track record of long-term enterprise customer retention and renewal, supported by measurable reductions in fraudulent traffic, automated abuse, and account takeover attempts reported by deploying customers.

20. Approov has been recognized in various technology ecosystems as an example of a successful deep-technology business commercializing sophisticated software engineering into a global enterprise security offering. Approov's customer base spans North America, Europe, the United Kingdom, and Asia-Pacific. Customers include retailers, banks and financial institutions, mobility and ride-hailing operators, ticketing and travel companies, healthcare providers, and connected-device operators.

21. Approov's competitive position rests on a substantial body of proprietary intellectual property, specifically the '858 Patent, as well as its trade secrets and confidential know-how relating to attestation. The company maintains active engagement with the academic

and applied-research community in cybersecurity, contributes to industry working groups, and publishes technical research and threat intelligence concerning emerging mobile API risks. Approov's mission is to enable trusted communication between mobile applications and the APIs they consume, removing the cost and risk imposed on businesses by automated abuse, fraud, and unauthorized access to meet the growing demand for runtime mobile attestation.

22. Guardsquare produces competing software services, systems, and products that protect mobile applications from tampering that are claimed by the '858 Patent. Guardsquare's customers include financial services, fintech, payments, healthcare, telecommunications, gaming, automotive, e-commerce, and the public sector.

23. On information and belief, Guardsquare NV was incorporated in Belgium in or around 2014 with the objective of commercializing mobile application protection technology primarily through obfuscation, rather than attestation. Since then, Guardsquare has expanded from a research-led Belgian start-up providing obfuscation solutions into an internationally recognized mobile application security vendor offering mobile application attestation functionality that competes with Approov using Approov's own patented technology.

24. Guardsquare's principal commercial products that leverage Approov's patented technology that is claimed in the '858 Patent include the device-side products and services of DexGuard (for android applications) and iXGuard (for iOS applications), when offered along with Guardsquare's Mobile App Attestation product and service (collectively referred to as the "Accused Products"). When the Accused Products are offered for sale, sold, and used together, the customer has the option to hash and verify the application's executing code for attestation. When this feature is enabled, the Accused Products make and use Approov's patented invention. Upon information and belief, Guardsquare's customers in the United States do in fact enable that

feature and use it. Guardsquare publishes a customer account of such a deployment, attributed to a "Security Operation Manager, AAA Gaming Studio, North America."

25. Guardsquare's successful integration of Approov's patented technology into the Accused Products and commercialization have caused Approov to lose customers and sales opportunities to Guardsquare and have positioned Guardsquare as a direct competitor of Approov in the mobile application attestation market. Guardsquare publicly announced its entry into that market on May 6, 2025, stating that "Guardsquare now offers mobile app attestation."

26. Guardsquare's customer base includes banks and financial institutions, payment service providers, mobile wallet and digital identity operators, healthcare and life-sciences companies, public-sector organizations, telecommunications operators, gaming and entertainment companies, automotive original equipment manufacturers, and consumer brands operating mobile channels. The company addresses both direct enterprise customers and a partner ecosystem comprising systems integrators, consulting firms, and technology partners. Guardsquare's Accused Products are deployed in production environments where the integrity, confidentiality, and authenticity of mobile software are material to revenue protection, regulatory compliance, intellectual property protection, or end-user safety.

27. Guardsquare is a competitor of Approov in the mobile application security market.

28. Guardsquare's mission is to enable secure mobile experiences by providing the most comprehensive mobile application security platform available to enterprises by incorporating Approov's patented attestation solution. As organizations continue to migrate revenue-generating, regulated, and customer-facing services to mobile applications, demand for layered mobile application protection, automated security testing, and real-time threat monitoring

is expected to continue growing. By leveraging Approov's patent technology, Guardsquare is positioned to address this demand.

29. Through its subsidiary Guardsquare Inc., Guardsquare has expanded its United States organization across sales, customer success, professional services, marketing, and select engineering and product functions. Upon information and belief, Guardsquare Inc. licenses and supports the Guardsquare mobile application security platform under terms set out in customer agreements executed by the company. Upon information and belief, Guardsquare Inc. transacts both directly with end customers and through a partner ecosystem comprising system integrators, consulting firms, channel resellers, and technology partners. Guardsquare Inc. deploys Guardsquare's products in production environments where the integrity, confidentiality, and authenticity of mobile software are material to revenue protection, regulatory compliance, intellectual property protection, or end-user safety. On information and belief, Guardsquare Inc. is licensed to commercialize the technology developed by Guardsquare.

**<u>THE PATENT-IN-SUIT</u>**

30. The '858 Patent discloses and claims a computer-implemented method and related system that enables a backend server computing device to determine whether a client software application (particularly a mobile app) executing on a client device has been tampered with. The key elements of the '858 Patent include, among others:

> A computer-implemented method of enabling a server computing device to determine if a client software application executing on a client computing device has not been tampered, the method comprising the steps of:
>
> > software executing on the server computing device, the software communicating either directly or indirectly with an attestation server;

the client software application running on the client computing device, the client software application communicating with the same said attestation server;

the client software application calculating a cryptographic hash fingerprint of its executing code image, wherein the cryptographic hash fingerprint is communicated to the attestation server to prove that the client software application is untampered;

the attestation server generating a pass or fail attestation result;

communicating the attestation result between the attestation server and the server computing device;

controlling the behaviour of the server computing device in a way that is conditional on whether a prior attestation of the client software application was a pass or fail attestation result,

wherein the communication between the attestation server and the server computing device is communicated indirectly via the client computing device by use of a signed token provided from the attestation server to the client computing device, in which:

> a shared secret key is known by the attestation server and the server computing device but not by the client computing device;
>
> said shared secret key being used to sign the token such that it proves that the signer is in possession of the secret key.

**INFRINGEMENT OF THE ‘858 PATENT**

31. Guardsquare makes, uses, offers for sale, sells, and provides its customers with a

mobile application attestation security feature that hashes and verifies the hash of its customer's application's executing code that is then used for attestation of the application. The mobile application attestation service is one feature (of several) that is made available to Guardsquare's customers when DexGuard, iXGuard, and Mobile Application Attestation are offered for sale, sold, and provided together. Guardsquare's customers directly infringe the '858 Patent: a customer that integrates Guardsquare's client-side components into its mobile application, enables the code-integrity attestation feature, and operates a backend server that validates Guardsquare attestation tokens thereby performs every step of the method of Claim 1 and makes and uses the system of Claim 18 within the United States. Further and in the alternative, Guardsquare directs and controls that performance, conditioning receipt of a valid attestation token on the customer performing those steps and establishing the manner and timing of that performance through its software, its integration requirements, and its technical documentation. Further and in the alternative, upon information and belief Guardsquare itself performs every step of Claim 1 and makes and uses the system of Claim 18 in its own development, testing, demonstration, and technical-support deployments within the United States, in which it operates or controls each claimed component.

32. The Accused Products analyze requesting mobile apps and device environments for authenticity, integrity, and modifications (including tampering); collects evidence from a client-side component integrated with the mobile app; generates a verdict (pass/fail or equivalent trust level); produces a cryptographically signed, short-lived token containing the verdict; and enables backend APIs to validate the token and conditionally grant or deny access to services and data based on the verdict.

33. The Accused Products calculate a real-time hash value of the application's

executing code image and compares the calculated real-time hash value to a known-good hash value as part of determining whether the application code has been modified or tampered with. The Accused Products communicate the resulting code-integrity evidence, including the result of the hash-based integrity check, to an attestation server as part of the attestation process. The attestation server evaluates the code-integrity evidence and generates an attestation result that is communicated to a backend server, which controls its behavior conditionally on the pass or fail result by either granting or denying the application access to services or data. Upon information and belief, the token issued by the attestation server is signed using key material provided by the customer, which is therefore known both to the attestation server and to the customer's backend server and is not known to or held by the client computing device; Guardsquare states in a recorded webinar that it will "encrypt that token using a key pair that you've provided so it's cryptographically signed." To the extent the comparison of the real-time hash value against the known-good hash value is performed on the client computing device, with the result of that comparison rather than the hash value itself communicated to the attestation server, that difference is insubstantial and the limitation is met under the doctrine of equivalents.

34. Publicly available descriptions of the Accused Products on Guardsquare's website support the allegation that the Accused Products perform substantially the same function as the claimed invention, including verifying client app integrity and enforcing backend access control, in substantially the same way, including using client-side integrity measurements, generating pass/fail or equivalent attestation results, and relaying results via signed tokens, to achieve substantially the same result, including preventing tampered or non-genuine apps from accessing protected backend services. A limitation-by-limitation comparison of the asserted claims against Guardsquare's own public descriptions of the Accused Products is attached hereto as Exhibit B.

35. On information and belief, any differences between the '858 Patent's claims and the Accused Products are insubstantial.

## CONDITIONS PRECEDENT

36. The Accused Products infringe at least Claims 1, 5, 6, 10, 18, 19 and 20 of the '858 Patent by meeting every limitation of those claims, either literally or under the doctrine of equivalents.

37. Guardsquare's acts of infringement have been and continue to be without Plaintiff's authorization, license, or consent. Approov has complied with the marking requirements of 35 U.S.C. § 287(a) to the extent applicable.

38. Approov has been damaged by Guardsquare's infringement of the '858 Patent and will continue to suffer irreparable harm unless Defendants are enjoined by this Court.

## HISTORICAL CONTEXT OF '858 PATENT

39. On November 2, 2021, the United States Patent and Trademark Office duly and lawfully issued the '858 Patent, titled "Client Software Attestation," to the named inventor Richard Michael Taylor of Edinburgh, United Kingdom. A true and correct copy of the '858 Patent is attached hereto as Exhibit A.

40. Approov, formerly named Critical Blue Ltd., is the owner of all right, title, and interest in and to the '858 Patent, including the right to sue for and recover damages for past, present, and future infringement.

41. The '858 Patent is valid and enforceable.

## PATENT ALLEGATIONS

### COUNT I – INFRINGEMENT OF THE '858 PATENT

### (METHOD CLAIMS)

42. Plaintiff Approov re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

43. Upon information and belief, Defendants Guardsquare have infringed and continues to infringe, literally or under the doctrine of equivalents, Claim 1 of the ‘858 Patent by using and performing each step of the method claimed in Claim 1 within the United States, and by inducing the infringement of the ‘858 Patent by its customers and end users.

44. Specifically, the Accused Products meet each and every limitation of Claim 1 of the ‘858 Patent, either literally or under the doctrine of equivalents, wherein:

> A computer-implemented method of enabling a server computing device to determine if a client software application executing on a client computing device has not been tampered, the method comprising the steps of:
>
> > software executing on the server computing device, the software communicating either directly or indirectly with an attestation server;
> >
> > the client software application running on the client computing device, the client software application communicating with the same said attestation server;
> >
> > the client software application calculating a cryptographic hash fingerprint of its executing code image, wherein the cryptographic hash fingerprint is communicated to the attestation server to prove that the client software application is untampered;
> >
> > the attestation server generating a pass or fail attestation result;
> >
> > communicating the attestation result between the attestation server and the server computing device;

controlling the behaviour of the server computing device in a way that is conditional on whether a prior attestation of the client software application was a pass or fail attestation result,

wherein the communication between the attestation server and the server computing device is communicated indirectly via the client computing device by use of a signed token provided from the attestation server to the client computing device, in which:

a shared secret key is known by the attestation server and the server computing device but not by the client computing device; said shared secret key being used to sign the token such that it proves that the signer is in possession of the secret key.

45. Any differences between the Accused Products and the claimed invention are insubstantial. To the extent any limitation is not literally met, the Accused Products meet that limitation under the doctrine of equivalents.

46. Guardsquare had knowledge of Approov's disclosed invention at least as early as November 14, 2019, when Approov disclosed its technology in furtherance of a proposed transaction with Guardsquare, subject to a Non-Disclosure Agreement. Guardsquare had actual knowledge of the '858 Patent and Approov's infringement allegations at least as of September 30, 2025, when Approov demanded that Guardsquare cease and desist its infringement of the '858 Patent.

47. As a direct and proximate result of Guardsquare's infringement, Approov has suffered and will continue to suffer damages in an amount to be proven at trial, including lost profits and/or a reasonable royalty.

48. Guardsquare's infringement is and has been willful, entitling Approov to enhanced damages under 35 U.S.C. § 284.

49. Approov has been and will continue to be irreparably harmed by Guardsquare's infringement, and monetary damages are inadequate to compensate Approov for such harm; therefore, Approov is entitled to preliminary and permanent injunctive relief.

50. Despite this knowledge, Defendant has continued to make, use, sell, offer for sale, and import products and services that infringe the '858 Patent; therefore, Defendant's infringement has been and continues to be willful and deliberate.

51. Defendant's willful infringement of the '858 Patent justifies an award of enhanced damages of up to three times the amount found or assessed pursuant to 35 U.S.C. § 284.

**COUNT II - INDUCED INFRINGEMENT OF THE '858 PATENT**

**(METHOD CLAIMS)**

52. Plaintiff Approov realleges and incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

53. Defendants Guardsquare have actively induced, and continue to actively induce, Guardsquare's customers, including application developers, and its users, including mobile device users, to infringe Claim 1 of the '858 Patent. Guardsquare has done so with specific intent to cause infringement by selling, maintaining, supporting, and providing software components, integration materials, technical instructions, and implementation guidance for the Accused Products that cause and encourage its use in a manner that performs the method claimed in Claim 1 of the '858 Patent.

54. Defendants Guardsquare further induces its customers to infringe by providing

instructions, technical support, marketing materials, and product specifications to Guardsquare's customers that cause and encourage the infringing conduct. These instructions, materials, and support include, without limitation, the following, each of which was captured through the Internet Archive's Wayback Machine on August 25, 2026: Guardsquare's App Attestation product description, https://www.guardsquare.com/introducing-mobile-app-attestation (archived at https://web.archive.org/web/20260825203000/https://www.guardsquare.com/introducing-mobile-app-attestation); Guardsquare's frequently asked questions, https://www.guardsquare.com/frequently-asked-questions (archived at https://web.archive.org/web/20260825203239/https://www.guardsquare.com/frequently-asked-questions); Guardsquare's published integration guidance describing how its customers configure attestation policies and validate attestation tokens at their backend servers, https://www.guardsquare.com/blog/app-attestation-mobile-app-security (archived at https://web.archive.org/web/20260825202607/https://www.guardsquare.com/blog/app-attestation-mobile-app-security) and https://www.guardsquare.com/blog/protect-apis-with-app-attestation (archived at https://web.archive.org/web/20260825203120/https://www.guardsquare.com/blog/protect-apis-with-app-attestation); Guardsquare's technical instructions for code checksumming, https://www.guardsquare.com/blog/code-checksumming (archived at https://web.archive.org/web/20260825202757/https://www.guardsquare.com/blog/code-checksumming); Guardsquare's recorded customer webinar "Guarantee it's Your App Interacting with Your APIs," https://www.guardsquare.com/webinar/on-demand/june-3-app-attestation-guarantee-its-your-app-interacting-with-your-apis-0 (archived at https://web.archive.org/web/20260825203712/https://www.guardsquare.com/webinar/on-

demand/june-3-app-attestation-guarantee-its-your-app-interacting-with-your-apis-0); Guardsquare's "Guided Workflow" integration program, https://www.guardsquare.com/mobile-app-protection-guided-workflow (archived at https://web.archive.org/web/20260825203443/https://www.guardsquare.com/mobile-app-protection-guided-workflow); and the technical documentation, integration materials, and support that Guardsquare provides to its customers through its customer portal at https://customers.guardsquare.com, which resolves to https://platform.guardsquare.com (archived at https://web.archive.org/web/20260825203808/https://platform.guardsquare.com/).

55. Defendants Guardsquare knew or should have known that its actions would induce infringement of the '858 Patent, and it acted with the specific intent to encourage and cause such infringement.

56. As a direct and proximate result of Guardsquare's inducement, Guardsquare's customers infringed and continue to infringe the '858 Patent, causing damage to Plaintiff.

57. Guardsquare's induced infringement of the '858 Patent has been and continues to be willful and deliberate.

**COUNT III – INFRINGEMENT OF THE '858 PATENT**

**(SYSTEM CLAIMS)**

58. Plaintiff Approov re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

59. Upon information and belief, Defendants Guardsquare have infringed and continues to infringe, literally or under the doctrine of equivalents, Claim 18 of the '858 Patent by making, using, offering for sale, selling, and importing the Accused Products in the United States, and by inducing the infringement of the '858 Patent by its customers and end users.

Guardsquare's customers make and use the claimed system by combining the client computing devices, Guardsquare's attestation server, and their own backend server computing devices into the claimed configuration and putting that system as a whole into service in the United States.

60. Specifically, the Accused Products meets each and every limitation of Claim 18 of the '858 Patent, either literally or under the doctrine of equivalents, wherein:

> A system including a server computing device, a client computing device and an attestation server,
>
> > wherein the server computing device is configured to determine if a client software application executable on the client computing device has not been tampered, wherein:
> >
> > the server computing device is configured to execute software, the software executable to communicate either directly or indirectly with the attestation server;
> >
> > the client computing device is configured to run the client software application, the client software application executable to communicate with the same said attestation server;
> >
> > the client software application is executable to calculate a cryptographic hash fingerprint of its executing code image, wherein the client software application is executable to communicate the cryptographic hash fingerprint to the attestation server to prove that the client software application is untampered;
> >
> > the attestation server is configured to generate a pass or fail attestation result;

the attestation server is configured to communicate the attestation result between the attestation server and the server computing device;

the server computing device is configured to control the behaviour of the server computing device in a way that is conditional on whether a prior attestation of the client software application was a pass or fail attestation result,

wherein the system is configured to communicate between the attestation server and the server computing device indirectly via the client computing device by use of a signed token provided from the attestation server to the client computing device, in which:

a shared secret key is known by the attestation server and the server computing device but not by the client computing device;

the attestation server is configured to sign the token using said shared secret key such that it proves that the signer is in possession of the secret key.

61. To the extent any limitation is not literally met, the Accused Products meet that limitation under the doctrine of equivalents, and any differences between the Accused Products and the claimed invention are insubstantial.

62. Guardsquare had knowledge of Approov's invention at least as early as November 14, 2019, when Approov disclosed its technology in furtherance of a proposed transaction with Guardsquare, subject to a Non-Disclosure Agreement. Guardsquare had actual knowledge of the '858 Patent and Approov's infringement allegations at least as of September 30, 2025, when Approov demanded that Guardsquare cease and desist its infringement of the

‘858 Patent.

63. As a direct and proximate result of Guardsquare’s infringement, Approov has suffered and will continue to suffer damages in an amount to be proven at trial, including lost profits and/or a reasonable royalty.

64. Guardsquare’s infringement is and has been willful, entitling Approov to enhanced damages under 35 U.S.C. § 284.

65. Approov has been and will continue to be irreparably harmed by Guardsquare’s infringement, and monetary damages are inadequate to compensate Approov for such harm; therefore, Approov is entitled to preliminary and permanent injunctive relief.

66. Despite this knowledge, Defendant has continued to make, use, sell, offer for sale, and import products and services that infringe the ‘858 Patent; therefore, Defendant’s infringement has been and continues to be willful and deliberate.

67. Defendant’s willful infringement of the ‘858 Patent justifies an award of enhanced damages of up to three times the amount found or assessed pursuant to 35 U.S.C. § 284.

**COUNT IV - INDUCED INFRINGEMENT OF THE ‘858 PATENT**

**(SYSTEM CLAIMS)**

68. Plaintiff Approov realleges and incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

69. Defendants Guardsquare have actively induced, and continue to actively induce, Guardsquare’s customers, including application developers, and its users, including mobile device users, to infringe Claim 18 of the ‘858 Patent. Guardsquare has done so with specific intent to cause infringement by selling, maintaining, supporting, and providing software

components, integration materials, technical instructions, and implementation guidance for the Accused Products that cause and encourage its use in a manner that makes or uses the system claimed in Claim 18 of the ‘858 Patent.

70. Defendants Guardsquare further induces its customers to infringe by providing instructions, technical support, marketing materials, and product specifications to Guardsquare’s customers that cause and encourage the infringing conduct. These instructions, materials, and support include, without limitation, the Guardsquare publications, recorded webinar, integration program, and customer portal identified above, each captured through the Internet Archive’s Wayback Machine on August 25, 2026.

71. Defendants Guardsquare knew or should have known that its actions would induce infringement of the ‘858 Patent, and it acted with the specific intent to encourage and cause such infringement.

72. As a direct and proximate result of Guardsquare’s inducement, Guardsquare’s customers infringed and continue to infringe the ‘858 Patent, causing damage to Plaintiff.

73. Guardsquare’s induced infringement of the ‘858 Patent has been and continues to be willful and deliberate.

## PRAYER FOR RELIEF

WHEREFORE, Approov respectfully requests that this Court enter judgment in its favor and against Guardsquare as follows:

A. A judgment that Guardsquare has infringed one or more claims of the ‘858 Patent, literally and/or under the doctrine of equivalents;

B. An award of damages adequate to compensate Approov for Guardsquare’s infringement, including lost profits, a reasonable royalty, and any other damages

permitted by law, together with pre- and post-judgment interest;

C. A judgment that Defendants' infringement of the '858 Patent has been willful, and an award of enhanced damages up to three times the amount found or assessed, pursuant to 35 U.S.C. § 284;

D. A permanent injunction enjoining Guardsquare, its officers, directors, agents, servants, employees, attorneys, and all persons in active concert or participation with them, from further infringement of the '858 Patent;

E. A finding that this is an exceptional case and an award of reasonable attorneys' fees under 35 U.S.C. § 285;

F. Costs of suit;

G. A judgment that each Defendant has induced infringement of the '858 Patent, and is therefore liable as an infringer under 35 U.S.C. § 271(b);

H. An award of supplemental damages for infringement occurring after the period covered by the evidence at trial through the date of final judgment, together with an accounting and, in the event a permanent injunction is not entered, an ongoing royalty for continued infringement; and

I. Such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Pursuant to FED. R. CIV. P. 38, Plaintiff Approov Ltd. hereby demands a trial by a jury on all issues so triable.

Dated: August 26, 2026

RESPECTFULLY SUBMITTED,

*/s/ Aaron S. Jacobs*

Robert R. Gilman (BBO No. 645224)
rgilman@princelobel.com
(617) 456-8017
Aaron S. Jacobs (BBO No. 677545)
ajacobs@princelobel.com
(617) 456-8082
Adriana Farias (BBO No. 715130)
afarias@princelobel.com
(617) 456-8080
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, MA 02110
Fax: (617) 456-8100

*Attorneys for Approov Ltd.*